# APPENDIX 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| In the matter of: | ) |
| | ) |
| CURTIS C. REDING, Trustee, | ) |
| Et Al., | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| vs. | ) Adv. No. 03-01071 |
| | ) |
| MORRIS BART, A.P.L.C., Et Al., | ) |
| | ) |
|     Defendants. | ) |
| | Montgomery, AL |
| | March 30, 2006, 10:18 a.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIAM R. SAWYER
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    Steve Olen, Esq.
                                Royce A. Ray, Esq.
                                Olen, Nicholas & Copeland, PC
                                P.O. Box 1826
                                Mobile, AL 36633

                                Von G. Memory, Esq.
                                Memory & Day
                                P.O. Box 4054
                                Montgomery, AL 36101

Electronic Recorder
Operator:                       Linda Bodden

Transcriber:                    Patricia Basham
                                6411 Quail Ridge Drive
                                Bartlett, TN  38135
                                9O1-372-O613

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

2

APPEARANCES (Continued):

                              Ms. Sabrina L. McKinney
                              Chapter 13 Trustee's Office
                              P.O. Box 173
                              Montgomery, AL 36101

                              David B. Anderson, Esq.
                              Ryan K. Cochran, Esq.
                              Deanna L. Weidner
                              Waller, Lansden, Dortch
                                & Davis, LLP
                              1901 Sixth Avenue North
                              Suite 1400
                              Birmingham, Alabama 35203

3

1          (CALL TO ORDER)

2          THE COURT: Please be seated.

3          COURTROOM DEPUTY: Chapter 13 case number 03-1071,

4    Curtis Reding, Trustee, versus Morris Bart, et al.

5          THE COURT: All right. Well, let's start with

6    appearances for the record. We will start on my left and work

7    our way around.

8          MS. McKINNEY: Sabrina McKinney for the Chapter 13

9    Trustee.

10          THE COURT: All right.

11          MR. RAY: Judge, Royce Ray for the plaintiffs.

12          THE COURT: All right.

13          MR. OLEN: Steve Olen for the plaintiffs.

14          MR. ANDERSON: David Anderson for the Gallagher

15    defendants.

16          MR. COCHRAN: Your Honor, Ryan Cochran for the

17    Gallagher defendants.

18          THE COURT: All right.

19          MS. WEIDNER: Deanna Weidner for the Gallagher

20    defendants.

21          MR. MEMORY: Von Memory for the Bart defendants.

22          THE COURT: All right. Good morning. Well,

23    unfortunately CM/ECF has gone down. So we will just have to

24    work from memory, I guess, but my recollection is that we had

25    several motions for summary judgment filed. In the meantime we

4

1    have had a settlement.  My recollection is that some months ago

2    Gallagher filed a motion for summary judgment and that's

3    basically what we have got.  Mr. Anderson, do we have anything

4    else?

5              MR. ANDERSON: I don't believe so today, Your Honor.

6              THE COURT: Okay.  And then – let's see.  Well, let's

7    do this then: Mr. Anderson, you are the moving party.  Why

8    don't you go first and then we will hear from any party who

9    wants to respond and then you will get the last word.

10             MR. ANDERSON: All right.  Thank you, Your Honor.

11             Your Honor, this case has been going on since 2003.

12   It involves about sixty claimants, sixty estates, and I think

13   we have gotten to a point where there is a settlement with Mr.

14   Bart and, if no one objects tomorrow on the negative notice, I

15   guess the settlement can be approved and it will be entered.

16             At one of the prior hearings, Mr. Olen has indicated

17   that Mr. Gallagher occupies a different situation than Mr.

18   Bart.  And Mr. Olen did indicate in a conference we had here

19   that Bart ought to file a motion for summary judgment, do it

20   the right way, the way that Mr. Anderson has done it and say

21   here is this debtor who is in this category, here is this

22   debtor who is in this category, and then they come back and put

23   in the record evidence that would show that they have a claim.

24             We have gone through on each of the claimants that

25   have claims against us because some of the sixty were claimants

1     that were only against Morris Bart.  It could have been a car
2     wreck or something.  So not all sixty flow through to Mr.
3     Gallagher by way of the referral contract but, in any event,
4     what has happened I think by way of this settlement is that the
5     plaintiffs have gone through.  They have done their case by
6     case analysis and, having done that, they concluded that fifty-
7     five of the sixty estates have no claim and will receive
8     nothing in the settlement.  They have concluded that five of
9     the estates will receive damages or an award and the award is
10    in excess of a hundred percent of the recovery.

11            So once the settlement goes through, those five
12    claimants will be paid in full and the case will be over and it
13    is due to be dismissed without even analyzing the sixty cases
14    and the facts of those sixty cases which they have not come
15    back with on their summary judgment and responded to.  So they
16    have not even put up evidence on those.

17            THE COURT:  Well, let me stop you right there because
18    unfortunately it has been a couple of weeks, maybe a month,
19    since I have read your motion.  My recollection is the thrust
20    of your motion was something to the effect that, you know,
21    Gallagher didn't know anything about the bankruptcy, had been
22    misled or misstated by his clients, and then I thought of the
23    thrust of your motion which had actually been filed sometime
24    ago.  What I'm hearing you say right now, if I am understanding
25    you correctly, and correct me if I don't have it, what you're

6

1    saying is, even if the trustee is correct, he has been made

2    whole by the Bart settlement, therefore he can't have a claim

3    against you. Is that -

4        MR. ANDERSON: On five of them and on the other fifty-

5    five, the trustees have gone through and concluded that they

6    don't have a claim against Bart and they don't have a claim

7    against us. So those fifty-five are gone by virtue of the

8    analysis that they went through to respond to our brief and

9    they couldn't respond to it and so they settled as if they had

10   no claim and these five do have a claim.

11       THE COURT: Okay. Now is that argument made in any of

12   your filings or is this something - you know, is this a

13   position that you are taking in light of the settlement which

14   is fairly recent?

15       MR. ANDERSON: Your Honor, that position will be ripe

16   to be taken if no objection is filed tomorrow and the

17   settlement is entered. Right now, the settlement has not been

18   approved and I suppose it could be denied and we could be back

19   trying the case with Morris Bart in it.

20       THE COURT: Okay. All right. So assuming that does

21   not happen, then you're saying basically if the settlement is

22   approved, then the whole case ought to be over, including the

23   case against Gallagher?

24       MR. ANDERSON: Correct and, if we put that aside, I am

25   saying we went through each of these estates that had Phen-Fen

1    claims and we analyzed them and we demonstrated that they

2    either did not have a claim or we did not have knowledge of

3    these bankruptcy cases when the funds were paid by the special

4    master.  I mean, what happened in this case was Morris Bart

5    advertises, gets clients.  He refers them to a group counsel,

6    group settling counsel that put together a group of five

7    thousand people and so he refers those cases to Mr. Gallagher

8    and other lawyers in Houston that put them in the group

9    settlement.  The group settlement involved a special master and

10   a proceeding in Mississippi in equity court.  The special

11   master handled the funds.

12        So what happens is you put in a claim, you have to

13   show that you took the drug.  Most of these people are no

14   injuries.  They prove they took the drug and that they are

15   willing to sign a release, they get thirteen thousand, five

16   hundred dollars.  If they can prove injury, then they get more

17   in the settlement.

18        So the award is made, the check gets mailed from the

19   special master to Morris Bart.  He then meets with, or his team

20   meets with these plaintiffs.  They come in, they sign this

21   statement and they say I am in bankruptcy or I am not in

22   bankruptcy.  So they check I am not in bankruptcy and he gives

23   them their check.

24        His woman, Lisa Cazaubon testified that if they do

25   check I am in bankruptcy, that document and the check was sent

8

back to the special master.  It wasn't even sent to Gallagher.
And so this occurs and they come back and say, yes, I am in
bankruptcy and then Morris Bart gets involved and then, in
September of 2001 this letter goes around.  There are these
twelve or thirteen people that have to be cleared up.  That is
when Mr. Martin came in and helped and all of those twelve or
thirteen people were cleared up and that is what Mr. Gallagher
knew.

And, in addition, what he did in 2003 is he started to
run Pacer searches and any time somebody shows up on a Pacer
search as having had a bankruptcy case, he tells the referring
counsel that they cannot receive any money until the proper
bankruptcy court approvals have been obtained or somebody
demonstrates that bankruptcy court approval is not necessary.

So right now we have got probably ninety or a hundred
and forty potential offers that estates can accept in Rezulin
and Lotronex settlements that are being held up pending court
approval, which is what we are trying to get done in these
other cases now.  And I don't know to what degree they are
involved in this case but, to the extent it is a course of
conduct, it has been raised in the case.

If I could answer any questions, I would, but I think
we have laid it out and they have not responded, they have not
shown that we had knowledge and did anything improper and there
is nothing to try.

9

1          THE COURT: Okay.  Thank you.

2          MR. OLEN: Your Honor, if I may approach the courtroom

3     deputy.

4          THE COURT: Yes, sir.

5          MR. OLEN: What I have here, Your Honor, and I am going

6     to go through in a minute, these are copies of exhibits that

7     are already part of our previous notice of filing, but I am

8     going to go through them in an organized fashion in just a

9     minute, and I have provided a copy to Mr. Anderson and I have

10    a copy for the court.  Let me just address a couple of things

11    quickly by way of laying the ground work.

12         In the Gallagher defendants' original motion for

13    summary judgment, obviously they don't raise the settlement as

14    an issue because the settlement didn't exist at that point in

15    time.  The only time that they raised the settlement as an

16    issue is in their reply brief, and we have not filed anything

17    in response to that, and our position is it is obviously

18    premature to raise a defense based on an event that has not yet

19    taken place.  I am not saying the settlement won't be approved.

20    All I am saying is, as we stand here today, that has not yet

21    happened.

22         THE COURT: I had understood Mr. Anderson to say

23    basically two different things.  One of which I was familiar

24    with and one of which I think was new.  The one thing he said,

25    going back to the point that the Gallagher defendants had made

10

1    on several occasions, basically saying, well, we didn't know

2    anything about these bankruptcies, we were doing, you know, the

3    Ritalin cases or whatever they were, you know, basically the

4    mass tort cases, the drug cases and all of that, and that we

5    didn't know about the bankruptcies.  And that was an issue you

6    filed a lengthy brief, an evidentiary submission with half-page

7    long citation to evidence that you think states the opposite.

8           MR. OLEN: And I am going to walk you through some of

9    the evidence on that very subject in just a minute.

10          THE COURT: Okay.  So that's part one.  Let's put that

11   aside for a minute and let's talk for just a second about the

12   other point that Mr. Anderson made that, like I said, maybe was

13   in the reply brief and I maybe just haven't gotten around to

14   reading it yet but I just wasn't aware of that yet.  But what

15   about his claim that the trustee or the estates have been made

16   whole by the Bart settlement?  I mean, are you trying to double

17   recover in any of these cases or is there anything to that?

18          MR.  OLEN:  Well,  you  have  asked  me  a  series  of

19   questions.  Let me try to answer them one at a time.  First of

20   all, Mr. Anderson – I mean, I appreciate him speaking for me

21   but he is incorrect in how he has characterized the manner in

22   which we propose to distribute the settlement money.  It is

23   correct that the estates that get money will have enough money

24   to pay, I think – I don't have it in front of me – at least

25   most of them will pay creditors in full.  But our position

1   about that is that the real issue here is an issue of
2   disgorgement by Mr. Gallagher, that Mr. Gallagher has money
3   that he should not have, and we think it will be for the court
4   to decide at a trial if and when the settlement is approved as
5   to what happens with that money.  As to the five - I am only
6   talking about the five estates now where their contention
7   apparently is going to be that they will be made whole.  And my
8   position there would be if in fact this court finds that Mr.
9   Gallagher did have knowledge of the bankruptcy and did exercise
10  dominion over estate property and did keep fees and expenses
11  without court approval, then we think this court certainly can
12  and we are going to urge this court to do something in the way
13  of disgorgement or some type of remedy for that conduct and
14  then we will look at what happens with the money.

15          There are some estates that the proposed settlement
16  distribution will not pay money into and we have claims against
17  Mr. Gallagher over some of those estates.  And, you know, the
18  linchpin of his statement this morning is that somehow the
19  trustee has determined that there are fifty-five estates that
20  do not have claims and that is not correct.  I don't want to
21  get ahead of where we are next week.  You know, we are going to
22  come in next week and explain why we propose to distribute the
23  money in the manner in which we propose to distribute it, but
24  I do not at all agree with his characterization that the
25  trustee has now got fifty-five claims that they have decided do

12

1    not have merit.

2          I mean, I can give you an example, Judge. Let me just

3    pick one example. There are some estates where, if you were to

4    pay money into the estate above the amount of money that is

5    owed, and there is not money owed to creditors, then our

6    concern would be the money might go back to a debtor and there

7    may be a debtor where there may be a question or an issue as to

8    whether they did all that they should have done about

9    disclosing the lawsuit.

10         So we have gone through a real, long process about how

11   we think the money ought to be distributed and, frankly, I

12   didn't really come in prepared to address that in detail but I

13   absolutely    disagree    vehemently    with    Mr.    Anderson's

14   characterization that the trustee has somehow determined that

15   there are fifty-five claims that no longer have any merit.

16   That is simply not the case.

17         What I would like to do - and, again, all of these

18   things are in evidence but to just talk about it a little bit

19   in an organized way because there is a lot of broad statements

20   that have been made by the Gallagher defendants in their brief

21   and what I would like to do is ask you if you would just turn

22   to tab one and, if you turn to tab one, and I am not going to

23   go through all of the pages behind tab one but just to give you

24   a feel for the linchpin of the Gallagher defendants' motion for

25   summary judgment is the statements that are replete throughout

13

1    their briefs, like the one on page three. "His special counsel

2    who, like Gallagher, acted without actual knowledge of the

3    bankruptcy case" - and it is in here over and over again -

4    "has neither actual notice or actual knowledge of the

5    bankruptcy case like Gallagher."

6        Page fifty - these are all excerpts behind that tab.

7    "In bankruptcy cases of which Gallagher was unaware." These

8    are quotes from their brief. "Again, in bankruptcy cases of

9    which he, referring to Gallagher, had no knowledge." Quote,

10   "It is undisputed that Gallagher did not have knowledge that

11   twenty-seven Phen-Fen clients had filed bankruptcy cases until

12   after the special master had paid the settlement funds to the

13   debtors," and it goes on like that and we heard it again this

14   morning.

15       And then they do the same thing in the reply brief.

16   Well, that is just not supported by the facts. It is

17   absolutely contradicted by the facts and I am going to go

18   through it and, in order to do that, I am going to briefly

19   cover a couple of deposition excerpts. Again, all of the

20   depositions are part of our notice of filing but let me set the

21   stage for you.

22       Gallagher got notice about these peoples' bankruptcies

23   in at least two, somewhat different ways. He got direct notice

24   in terms of written communications, and we are going to look at

25   some of those in a moment, but Gallagher also got telephone

14

1    calls from people at the Bart Law firm telling him that here is

2    a debtor, you know, here is another debtor and they checked

3    "yes," I am currently in bankruptcy. Gallagher says in his

4    brief, and they said it again this morning, that the first

5    notice he ever got of somebody being in bankruptcy was

6    September 4, 2001. I wrote it down on my pad and it is in

7    their reply brief. And essentially what you have at tab two,

8    and I think I will just tell you what it is and then jump ahead

9    to some of the specific evidence. Tab two is some excerpts

10   from the deposition of Morris Bart. And what Mr. Bart

11   explains, Your Honor, is that his law firm's both procedure and

12   actual practice was that every time they found out that there

13   was a debtor who said, yes, I am in bankruptcy, somebody

14   contacted Michael Gallagher and told him about it. You will

15   see one of them right there at the very first excerpt, which is

16   page 245, and there are several there that are highlighted, and

17   I won't read each one to you but it is there.

18           For instance, 214, "Anytime we were aware of a

19   problem," and there are questions leading up to it about

20   bankruptcy, "we immediately communicated with the Gallagher

21   group and we then assumed action would be taken."

22           On 217, Bart says, "Those letters would have gone to

23   her," meaning Lisa Cazaubon in his law firm, "and she then

24   would have personally communicated with the Gallagher group or

25   with the Gallagher's firm."

15

1        The next page, "The protocol is the same in that when

2   we hear of a problem, we then call the Gallagher group." And

3   this is important because the Gallagher defendant's brief

4   sticks its head in the sand and thinks if they ignore hard

5   enough all of this evidence in the record, it is going to go

6   away.

7        Now tab three is Lisa Cazaubon. She was the head of

8   the mass tort slash class action department for Morris Bart and

9   she says basically the same thing. For instance, the first

10  excerpt behind tab three she is asked a question about getting

11  the name of the bankruptcy attorney and the trustee and their

12  address and phone numbers. "Why did the Bart Law firm want

13  that information?" Answer, "So that I could forward it to Mr.

14  Gallagher or his associates so that they could handle it."

15       I won't belabor all of these. I just wanted to cover

16  a couple. Now it is very interesting, when you get to Mr.

17  Gallagher's deposition, I will give him credit for one thing.

18  He didn't try to overreach in terms of denying notice. What he

19  would say when asked pointed questions is - and let me find

20  some of the excerpts. At page 121, "Did Morris Bart ever tell

21  you, look, starting in April of 2001" - this would be about the

22  seventh or eighth page in. They are not necessarily in

23  numerical order. The numbers are in the upper right-hand

24  corner but, if you look at page 121, behind tab four. "Did

25  Morris Bart ever tell you, look, starting in April of 2001 I

16

1    started getting in several of these where people said, yes, I

2    am in bankruptcy?  We had a discussion and it may have been

3    about when they started coming in but I am not sure."

4            He doesn't say, no, it didn't happen that way.  He

5    doesn't say in his deposition, no, I never got notice until

6    September.  He is not testifying to that because he knows he

7    cannot.  He knows that would not be truthful.

8            The next page.  It is page sixty-five.  "Is it correct

9    that by early April 2001 you were informed from some source

10   that you and Mr. Bart had some clients who had checked, yes, I

11   am currently in bankruptcy on these settlement forms?"  And,

12   again, he says, "I don't recall the date we were informed."  He

13   never says when he knew.

14           All right.  Sort of connected to that, you know, sort

15   of hand in hand with this - I didn't know about it - Gallagher

16   also says this wasn't my job to do.  He cross-claims against

17   Bart first and he said it is Morris Bart's job to do.  He is

18   not happy with that.  He goes after Mr. Martin and it is Mr.

19   Martin's job.  And then we get briefs and he says it is the

20   debtor's fault.  At one point he says it is Sabrina McKinney's

21   fault and he is going to sue her, and on and on.

22           The most telling bit of deposition testimony, Your

23   Honor, is Pam McLemore.  She is Mr. Gallagher's legal

24   assistant, right-hand person.  And if you will look behind tab

25   five, I asked her at the bottom of 141, "What about people that

17

happen to have a claim and are in bankruptcy; how do you handle that?"  And look at what she says.  "The only referral lawyer that has ever asked us" – "us" being Gallagher – "to take care of their bankruptcy issues was when Morris Bart asked us in Phen-Fen."  Now that is not what their briefs say but that is what their witness said under oath.

If you will look at tab – I'm going to go through some of the tabs.  I won't go through all of them but I want you to just get a feel for the fact that the record is absolutely rampant, replete, overflowing with evidence of the knowledge that Bart had, contrary to what they say.

Tab six I will cover briefly.  It is just this co-counsel agreement between Bart and Gallagher and in it I have highlighted the sentence where it says, quote, "Gallagher will assume full responsibility for all aspects of litigation."

And then if you turn to tab seven, when Mr. Bart first third-partied Mr. Gallagher in the Tuscaloosa case, Mr. Gallagher appeared pro se.  So he signed this pleading and on the second page he says, "Third-party defendants" – that means Gallagher – "admit that they undertook primary responsibility for the representation of the Phen-Fen clients."  And you have got that, combined with Ms. McLemore saying the one time that the referring lawyer had us handle the bankruptcy issues was Phen-Fen with Morris Bart.

Next, let me direct your attention to tab eight.  This

18

1    is one of these release sheets for Sandra Joiner.  She is a

2    debtor in the Middle District of Alabama and, lo and behold, it

3    is dated April 3, 2001.  I count that to be some five months

4    before Mr. Gallagher in his brief says that he didn't have any

5    notice.

6        And if you go back to the deposition excerpts, again

7    you will see, Your Honor, that the Bart witnesses are telling

8    us over and over again they called Gallagher about this, they

9    sent the information on to Gallagher about this and that

10   evidence - you know, we are at the summary judgment stage - we

11   get all of the inferences from that evidence but it is better

12   than that.  That evidence is unrebutted because Mr. Ray and I

13   are there for a whole day in New Orleans and we are asking Mr.

14   Bart and we are asking Ms. Cazaubon question after question.

15   We sent it to Gallagher.  It was Gallagher's job.  Every time

16   we knew about bankruptcy we told Gallagher about it.

17       And if you look at the very last page of tab two, this

18   is very telling.  This is after Mr. Bart says over and over and

19   over again two things.  It was Gallagher's job to do this and

20   we told Gallagher every time we found out somebody was in

21   bankruptcy.  Mr. Bart is asked one single question on cross-

22   examination by Gallagher's lawyer, "How old are you?"  That is

23   it.  One question.  And that tells me that we get the inference

24   that they have absolutely nothing to cross-examine him about.

25   They had nothing to undercut what he says over and over again.

19

1          If you look at the last page behind tab three, you

2     will see that the only people who examined Lisa Cazaubon are

3     Steve Olen and Joe Schilleci.  Mr. Gallagher's lawyers did not

4     ask Ms. Cazaubon a single question after she said, again and

5     again, their policy and their practice was to send all of these

6     things on to Mr. Gallagher.

7          Even more interesting, if you will look behind tab

8     eight at exhibit 562 - this is Sandra Joiner - and Your Honor

9     will see that there appear to be two copies of the same release

10    and acknowledgment or whatever you call this, "Diet Drugs II,

11    Qualified Settlement Fund, Release and Distribution Changes."

12    And I will submit to you that the body of each document is

13    identical but there is one very important difference.  If you

14    look at the first page, the Bates number starts with a one.  Do

15    you see that on the first page?  It is 109309.

16          THE COURT: I do see that.

17          MR. OLEN: That means if it is a one, that document was

18    produced to us by the Bart defendants.  If you will turn to the

19    second page - I'm sure you know where I'm headed - it starts

20    with a two.  Mr. Gallagher had this document.  He produced it,

21    but he tells us he didn't have notice until September of 2001.

22    It ain't so.

23          The next tab, tab nine, the same thing.  Gloria Ford.

24    Yes, I am currently in bankruptcy, April 3, 2001.  We have

25    already got Bart's people, Bart and his top assistant on these

20

1    kind of cases, saying they sent these things to Gallagher.
2    And, lo and behold, here again you turn to the second page, Mr.
3    Gallagher had this document and, if nothing else, I am
4    certainly entitled to an inference that he got it
5    contemporaneously and I think we get that in any event based on
6    the fact that that is what Bart and Cazaubon said that they
7    were doing.

8         But he says he didn't know anybody was in bankruptcy
9    until after the money was distributed. Baloney. And, you see,
10   they admitted this morning that if somebody checked "yes," then
11   the money didn't get distributed right away. Ms. Joiner was
12   not one of the people that they asked Mr. Martin to tend to.
13   She fell through the cracks. And so money went to her, they
14   took their fees. They knew she was in bankruptcy and they did
15   zippo. They didn't even ask Ben Martin to do anything about
16   her.

17        The same is true of Gloria Ford. She was not one of
18   the people that Ben Martin was asked to attend to. Nothing was
19   done. They don't have a shred of evidence that they did
20   anything except pay Gloria Ford and pay Sandra Joiner their
21   settlements and take their fees and expenses. Never file an
22   application, never move to approve the settlement, never move
23   to get their fees and expenses approved. And then they had the
24   audacity to come in here and tell you their client didn't -
25   their client tells you he didn't know until September.

1      Tab ten.  I mean, I just find this - never mind.  Let
2  me just go through.  Edward Childs, the debtor in whose case we
3  brought the adversary proceeding.  April 27, 2001.  Now I have
4  to give them credit for one thing.  They at least sort of got
5  near the ballpark with Childs.  The trustee in this one single
6  case did file a motion to approve the settlement.  They never
7  moved to get employed.  They haven't done that yet.  They never
8  moved to get their fees and expenses approved.  They do say
9  that they didn't really do anything wrong but they paid their
10  fees back to Mr. Reding just because they are good guys and
11  they thought that would be the thing to do because they didn't
12  want to litigate.

13      And here we are, what, three and half years later from
14  the Tuscaloosa case and we're supposed to believe that they
15  paid in that little bit of money because they, quote, didn't
16  want to litigate.  April 27, they knew about Mr. Childs, Your
17  Honor.

18      The next tab.  You know, this one looks to me like the
19  lady checked "yes" and somebody has changed the answer.  There
20  are two like that.  I will skip over those.

21      Look at tab thirteen, Angela Jarrett.  She signs this
22  on July 3, 2001.  Now they say in their brief that Angela
23  Jarrett's case was dismissed before they knew she was in
24  bankruptcy.  That is not correct.  If you will look on the
25  docket sheet, you will see that her case was dismissed, I think

22

1    it was July 9, 2001, but they did know she was in bankruptcy.

2    And back in April, they know this is an issue and now I am not

3    even covering with you all of the debtors they had up in

4    Tuscaloosa and Birmingham.  They had many more up there than

5    they did down here who were checking "yes."  Of course, nobody

6    has touched the Pacer system and then they want to come in and

7    brag, boy, give us a pat on the back.  In the fall of 2003, we

8    were banging our fingers out on Pacer.  Well, that is about two

9    and a half years late, and that is because they got caught with

10   their hand in the cookie jar at that point.  They had been sued

11   by Mr. Cottingham at that point and they had been sued by Mr.

12   Reding when they decide that Pacer is a good thing.

13        In fact, the truth there is - I don't think it is in

14   my excerpts but I remember it.  Ms. McLemore was honest enough

15   to admit that it was her first set of lawyers, Mr. Robinson and

16   Mr. Woodard, one of them, who told them about Pacer.  That is

17   how they found out about it.

18        Angela Jarrett.  Now, Angela Jarrett at least gets her

19   name on a list of their people in bankruptcy at some point- you

20   will see that in a moment - unlike Joiner and Ford who they

21   don't even turn over to Ben Martin and who got their money.

22   And then they come in here and tell you they didn't know

23   anybody was in bankruptcy until September of '01 and nobody got

24   their money.  I mean, they didn't know anything about anybody's

25   bankruptcy until after all of those people got their money.

1          Fourteen is another one by Childs.  It is August 22.

2     Now let me just cover briefly tab fifteen and I am using the

3     tab numbers.  You will see the exhibit numbers when we turn the

4     page.  And, again, these are all exhibits.  They have been, you

5     know, deposition exhibits all this time.  They are in our

6     notice of filing.  They did get around – this is the Bart

7     defendants list.  I want to be clear about that.  And, you

8     know, there is not a specific piece of testimony where somebody

9     says this exact precise list went to the Gallagher defendants,

10    but you will see Edward Childs on there and you will see Angela

11    Jarrett Flordine on there.  I call her Jarrett because that was

12    the name on her bankruptcy case, and then there are a bunch of

13    other people from Alabama.  You will see that on there. A lot

14    of them checked "yes."   John Anderson, Sarah Dial, Jerry

15    Hogland, Keisha Killings, Donna Martin, Connie Miles, Andy

16    Nabors, Teresa Williams, all of those checked "yes" in

17    Tuscaloosa and Birmingham.

18          But now what you don't see on here, Your Honor, is you

19    don't see Sandra Joiner and Gloria Ford, for example.  Those

20    are the two I remember off of the top of my head.  I mean, they

21    didn't even make their list but they got their money.  But, oh,

22    they didn't know about that.  Nonsense.

23          Then if you turn to tab sixteen, this is the letter

24    that they are saying was Gallagher's first notice.  Now, look

25    at what we have seen up until this point in time.  This is what

24

they say.  It is in their reply brief.  It is September 4, the first time they had any notice of this bankruptcy issue.  And look at what Mr. Bart says and keep in mind what Ms. McLemore said.  The last sentence of the first paragraph.  We have got Mr. Gallagher saying, oh, he didn't do this, this was the referring lawyer.  It was Mr. Bart who did this.  It was Mr. Martin who did this.  Bart writes him in the very letter they want to rely on and says, quote, "I am turning these cases" – and in the previous sentence it says, "There are several problem settlements remaining, primarily because of bankruptcy and debt.  Bankruptcy.  "I am turning these cases back over to you to resolve these problems so we can complete the settlements."  Bart is turning this over to Gallagher to handle.  And then there is a list attached and Edward Childs is on that list and a bunch of the Tuscaloosa and Birmingham people are on the list.

And then tab seventeen, it is another letter to Gallagher.  I will skip it.  Let me next show you what is behind tab eighteen.  This is the one single document that I just now realize, as I look at it, is not in our notice of filing.  The Gallagher defendants took an excerpt from the Bart defendants' summary judgment brief and, when I pulled it out to look at it, I looked at all of the exhibits and it was the first time the Bart defendants had produced this document right here.  So I included it because Charstian Hicks is one of the

1   Montgomery people, Montgomery debtors, that Sabrina McKinney

2   wrote them letter after letter about. And in their brief they

3   said they never got a document where she said, yes, she was in

4   bankruptcy. Well, it had not been produced in a litigation.

5   That would be correct. But, in fact, Charstian Hicks on

6   September 21, 2001, said, "yes," she was in bankruptcy.

7          If you turn to tab nineteen, here is yet another list

8   and it has got Edward Childs on it again, and you will see

9   these are documents going to Gallagher. This isn't even, you

10  know, Bart forwarding. It is something that is addressed or

11  copied to Mr. Gallagher.

12         Tab twenty, September 26 letter. Tab twenty-one, here

13  is where they send on a letter from Collier Espy about Edward

14  Childs and, if you look down at the bottom at the highlighting,

15  it says, "Info on Charstain Hicks" - it should be Charstian -

16  "Notice of Chapter 13 deadline." And this is going to Tim Goss

17  who Gallagher testified had a role like Ben Martin in helping

18  deal with the bankruptcy issues. If you turn to tab twenty-

19  two, here is this document that was sent their way September of

20  '01.

21         And Ms. Hicks, they want to make a big deal of the

22  fact that her bankruptcy was ultimately dismissed. Well, it

23  was dismissed in like July of 2002 and the settlement proceeds

24  never got paid to the trustee, never. And you will see in a

25  minute it isn't for want of trying by Ms. McKinney. We are

26

1    going to come to that.  There is not going to be any of this
2    somehow the trustee dropped the ball.  You know, this was
3    produced by the Bart defendants.  A copy went to Goss.  Bart
4    refers to the team as Gallagher and Martin and Goss.

5           And then I want to direct your attention to
6    Plaintiff's Exhibit 5, which is behind tab twenty-three.  Now
7    this is a letter from Tim Goss and it is to Bart and it is
8    copied to Michael Gallagher but it is very interesting.  Mr.
9    Gallagher says he didn't know anything before September of '01
10   but, in this letter, Goss says – and if you go back to
11   Gallagher's deposition, Your Honor, he talks about how he and
12   Goss were in Phen-Fen one together.  That was the first round.
13   And these cases are part of Phen-Fen two.  So they had a
14   previous set of Phen-Fen settlements.

15          "Morris Bart's office is in the process of addressing
16   issues relating to bankruptcy clients and clients with estate
17   issues.  I recall that we have already been through these
18   issues with previous clients."

19          Somebody knew about the bankruptcy issues before
20   October of 2001.  And then they had a conference call about it.

21          And then, lo and behold, the next day, if you look at
22   tab twenty-four, they write Mr. Reding a letter, and the first
23   page is his handwritten notes.  The second page is the letter
24   and the third page is an attachment.  Rosie Davidson is a third
25   debtor, and I should point out there are three debtors as to

1    whom the Gallagher defendants are correct that the claims are

2    due to be dismissed, Your Honor. There are only three. One is

3    Rosie Davidson. We are satisfied at this point in the record

4    that her case was dismissed before she signed the document

5    saying, yes, she is in bankruptcy. This is the case where Ms.

6    McKinney wrote a letter and said she didn't think she had a

7    claim to the proceeds, and we wanted to make sure that, when we

8    got through with all of the discovery, there wasn't anything

9    that showed any earlier notice. Rosie Davidson, you know,

10   whether we amend the complaint to amend it out or whatever, we

11   concede that there is not a claim for Rosie Davidson. And the

12   Gallagher defendants have provided us documents that show there

13   are two other people who in fact were never clients of

14   Gallagher and Bart mistakenly identified them as someone he

15   referred to Gallagher. It is Christine Kelley. She was never

16   a Gallagher client and they have satisfied us of that. And

17   Haynes, Lisa Haynes. It turns out there are two Lisa Haynes.

18   Gallagher had a Lisa Haynes in Mississippi so it took them a

19   while to realize this was someone different. So we concede

20   that their motion is well taken as to those three debtors.

21        I thought I should mention it so you would know why I

22   am not talking about Rosie Davidson.

23        So the day after they have their conference call and

24   the same day as you might imagine, they write an identical

25   letter to David Cottingham in Tuscaloosa and they identify four

28

1    or five debtors and they write an identical letter to the then

2    Chapter 13 trustee in Birmingham, David Rodgers.

3        And then - let me try to skip over some of these.

4    Behind tab twenty-five there is yet another letter and it

5    mentions Hicks and Childs and it goes on like that.  But then

6    I want to show you behind tab twenty-eight Ms. McKinney writes

7    Morris Bart and, again, if you go back to the deposition

8    excerpts, you are going to see that Lisa Cazaubon and Morris

9    Bart have testified, without being cross-examined other than

10   how old are you, Mr. Bart, that any time they got letters like

11   this, they either sent them on to Gallagher or they picked up

12   the phone and called Gallagher.  So he knew about this letter.

13   And Ms. McKinney spelled it out for them, Your Honor.  These

14   proceeds would represent property of the debtor's estate and

15   the debtor's plan provides that all property of the estate

16   would remain in the estate.

17       And in response to her first letter, she got a great

18   big zip.  Tab twenty-nine, she writes the virtually identical

19   letter on Charstian Hicks.  Gallagher's response, "o" for two

20   after that letter.  Bart is "o" for two also but we are here

21   about Gallagher.  He is "o" for two.

22       Then they do yet another updated bankruptcy list

23   behind tab thirty.  They are big on lists.  They just don't do

24   anything with the list.  And if you look at the last page of

25   tab thirty, there is Ms. Hicks and there is Mr. Childs, the

29

1    same people that Ms. McKinney is writing them about and telling

2    them what they need to do and what they are doing is keeping

3    them on a list and they haven't applied to be employed; they

4    haven't moved to have their fees and expenses approved. Not to

5    this day. It is five years. It hasn't happened yet.

6        Tab thirty-one. I am toward the end of the tabs, Your

7    Honor. Ms. McKinney being the persistent individual that I

8    have come to know her to be, she is not dissuaded. She writes

9    them again. She tells them she hasn't heard anything. Tells

10   them the appropriate motions need to be filed. No response.

11   Nothing. Tab thirty-two, she writes them the same day on the

12   Hicks file. No response. None. Not a phone call, not a

13   letter, zip.

14       Then this is just absolutely fascinating. Starting at

15   tab thirty-three, what activity is going on between Gallagher

16   and Bart? They are writing letters back and forth to each

17   other about, hey, we have got to get these cases cleared up so

18   we can get our hands on our fees. We need some more money

19   here, and that is what thirty-three is about. You list the

20   following clients as being in bankruptcy. And, again, they

21   mention - this time they mention Hicks and this goes to Al

22   Waters who is at the Gallagher law firm. A copy goes to

23   Michael Gallagher. And then attached to it is some of the

24   people who checked "yes" in Tuscaloosa.

25       Tab thirty-four, Ms. McKinney hasn't given up yet,

30

1   Your Honor.  She is on letter number five on Hicks and Childs

2   and she hasn't hear anything yet and she doesn't hear anything

3   in response to this letter.  And if you turn to tab thirty-

4   five, she writes the same letter on Hicks.  She is now "o" for

5   six.

6           And then particularly interesting is tab thirty-six.

7   Now, I think I heard the Gallagher defendants say they didn't

8   know any of these people were in bankruptcy.  Mr. Gallagher, he

9   didn't  know  anything  about  it.   I  just  think  it  takes

10  incredible nerve to come in here and tell you that is what the

11  state of the record evidence is.

12          March  6,  2002,  Pam  McLemore  received  this

13  communication.  Now she is Mr. Gallagher's right-hand person.

14  And they get this communication about, among other things,

15  bankruptcy.  And what it is, the Bart law firm has done an

16  internal memorandum which they have then faxed to the Gallagher

17  law firm.  And look at the second page.  Mr. Gallagher, who

18  said he didn't know about Mr. Childs' bankruptcy until after

19  Mr. Childs got his money.  That is what they say.  The Bart

20  people spell out what happened.  They are referring now to Ms.

21  McKinney's third letter and I think they somewhat accurately

22  describe what it is.  The appropriate motions need to be filed

23  in order to release the settlement fund, that this is coming

24  from the Chapter 13 trustee for the Middle District of Alabama.

25  And this goes to the Gallagher law firm, Your Honor.  And then

31

1    if you look at the next page they get the same information

2    about Charstian Hicks and then look at the bottom of the page.

3    How many times do they have to be told what to do?  "We have

4    been informed by Mr. Cochran's office" – this is the special

5    master – "that a motion and order will be required in order to

6    release all settlement funds."  Ms. McKinney has been telling

7    them that.

8         Then if you turn to tab thirty-seven, this one is not

9    talking about let's deal with these bankruptcy issues.  It is

10   not talking about let's file applications to be employed, let's

11   get settlements approved, let's get fees approved.  It is, you

12   know, we want to get the rest of our fees.  And this is a

13   letter to John Kim, a lawyer at the Gallagher firm.

14        You turn to the second page, there is Charstian Hicks

15   name, a copy to Michael Gallagher.  "These clients are in

16   bankruptcy proceedings.  We have been advised that a motion and

17   order is needed in order to release these funds."  We are now

18   March of 2002.  Nothing has been filed.  Ms. McKinney hasn't

19   heard a word.  And she started communicating with them in mid

20   October.

21        Tab thirty-eight, Ms. McKinney still doesn't give up,

22   Your Honor.  This time she gets Collier Espy to write a letter.

23        Tab thirty-nine, what do they do in response?  They

24   write each other about fees again.  There it is.  Re: Phen-Fen

25   Outstanding Fees.  She was requesting assistance in resolving

32

1    the balance of the Phen-Fen fees.  You can see attached to this
2    would have been the letter we just looked at.  So we are just
3    seeing it all over again.

4         And then tab forty, this time somebody has written
5    with a marker type thing "very important" and it has these same
6    letters attached.  They want the rest of their fees.  Now they
7    don't want to come to bankruptcy court in Montgomery and
8    Tuscaloosa and Birmingham and do the right thing; they just
9    want their fees.

10        Tab forty-one, Ben Martin gets bent out of shape
11   because somebody is poking at him, trying to put the blame on
12   him and he writes a letter back and he tells them exactly what
13   he has done and what he has not done.  And he says just what he
14   said in his summary judgment papers.  You know, yes, I got in
15   touch with trustees; yes, I got in touch with debtor's lawyers;
16   but I didn't do anything to get you all approved.  I wasn't
17   asked to do that and I didn't do that.  And he talks about
18   different bankruptcy debtors by name.

19        Tab forty-two, this is the Chapter 13 trustee's case
20   notes.  In addition, by now they have written six letters and
21   they have gotten Mr. Espy to write a letter.  You will see that
22   on the last page of this exhibit Sherry Rogers, the legal
23   assistant who worked and works under McKinney's direction,
24   called the Bart law firm on May 6 and called them again on May
25   13.  At some point I guess she got Michael Gallagher's name.

33

1   This document doesn't tell you how and on May 29, 2002, seven

2   months later, seven and a half months later, she writes a

3   letter to Michael Gallagher and look at tab forty-three.  She

4   writes him a letter about Hicks and Childs, wanting to know

5   what is up.

6        Now this is just what they were learning in

7   Montgomery.  We have all of the evidence, the notice evidence

8   in the record from Tuscaloosa and Birmingham but I haven't gone

9   through all of those and they were getting all of those all

10  over the place, too, a lot more than they were getting here.

11  In fact, if you look at their brief, they say there were only

12  three who checked "yes" in Montgomery.  That is not correct but

13  that there were thirteen on their list.  Well, there were a lot

14  more in Tuscaloosa and Birmingham than there were just here.

15  And at this point in late May of 2002, zero applications to

16  employ.  There was a single motion to approve a settlement that

17  Ms. McKinney's office had filed in the Childs case, and they

18  didn't do it again after that because they made the decision it

19  wasn't their place to be filing motions to get settlements

20  approved when these outside lawyers were the ones who knew what

21  the settlement was about.

22        And as we sit here today in these Phen-Fen cases, the

23  record is perfect.  Zero applications to employ, zero motions

24  to approve a settlement that they have ever caused to be filed.

25  There was one filed here by Ms. McKinney and I think one filed

34

1     by a debtor's attorney in Tuscaloosa but not at their request,

2     not at Gallagher's request, you understand. And they are "o"

3     for however many in terms of motions to approve their fees and

4     expenses. But they say in their brief that they never took a

5     dime except when they took it before they ever knew that

6     anybody was in bankruptcy.

7              Now I want to go back a minute to a couple of really

8     important deposition excerpts of Mr. Gallagher because Mr.

9     Gallagher, some of his other themes are no duty, no duty, no

10    duty. He doesn't have a duty to do this, and I will come back

11    to the duty part of our brief in a minute.

12             Let me just tell you, despite what Mr. Gallagher's

13    legal briefs in this case say, let me tell you what Mr.

14    Gallagher knew. All of the time he is getting all of this

15    stuff - I must have asked him something about - yeah, you look

16    at the top of the page and I highlighted something about some

17    Chapter 11 bankruptcy debtor. My recollection is he had a

18    single occasion where he had filed an application to be

19    employed in Texas and his client was Gold something. What was

20    it, Royce, Gold Kist?

21             MR. RAY: I think Gold Line.

22             MR. OLEN: Gold something, Your Honor. So I was asking

23    about that and then I asked him did he learn from that

24    experience, you know, about the need to file an application for

25    employment with the bankruptcy court. Turn over to the next

1    page and you will see that Mr. Gallagher didn't need Ms.

2    McKinney to tell him what he was supposed to do. He knew. He

3    knew. "And I did know and do know - I did know and do know

4    that if somebody is in bankruptcy that the cause of action

5    could be an asset of the estate that would be distributed to

6    creditors. But if somebody comes in and tells me they are in

7    bankruptcy and they have a cause of action, certainly that

8    waves a flag in my face that there are things that need to be

9    done before you can proceed." This is Michael Gallagher's

10    sworn testimony.

11         Now this, of course, is never mentioned in their

12    briefs and is directly contrary to what the main themes of

13    their briefs are, that he didn't know, he left this up to

14    others, that he didn't have a duty.

15         And then if you turn to the next page, it actually

16    gets better. This is page ninety-nine. I ask him, you know,

17    where did you learn that if somebody is in bankruptcy that you

18    couldn't distribute money to them. Answer, his words, not

19    mine, "I have known that my whole life. I have known that, my

20    life as a lawyer."

21         And so then I asked him, "That is something you knew

22    before somebody checked "yes" on the form?" And he says, "Yes,

23    yes."

24         The next page, just to make sure we cover all of the

25    bases, "I knew" - I knew - "that we had" - we had - "to have an

36

1    approval of the settlement by the bankruptcy court and I have

2    known that my entire life."

3        And then further down, "I knew that we had to have

4    approval by the bankruptcy court for the funds to be

5    disbursed."  And then the next page -  I mean, he even tells

6    you what it is that he is supposed to do if in fact he doesn't

7    do what he is supposed to do the first go around.  He knows

8    that, if he doesn't get employed and if he doesn't do these

9    things in bankruptcy court, he says, "I think if you don't get

10   it approved, then you have to withdraw from the litigation."

11   He hasn't done that either.  He never backed out of these Phen-

12   Fen cases.  He took his money and ran and filed nothing,

13   nothing.  "If you don't go through the proper channels in the

14   bankruptcy court, you have to withdraw from the litigation."

15       All right.  Then the next point I want to make, let's

16   assume for the moment, which I don't concede, that there is

17   some merit to the argument that, oh, I am poor helpless Michael

18   Gallagher and I can't do anything about getting these

19   employment applications filed myself, somebody else has to do

20   it.  Okay.  Let's just assume for the moment, we will take a

21   Chapter 7.  I think reasonable argument could be made that the

22   trustee, the Chapter 7 trustee is certainly the place to start.

23   There are cases out there that say if you ask to have it done

24   and it doesn't get done, then you have got to do something

25   about it.  I know Your Honor is familiar with those cases.  But

37

1  look at what he did here, Your Honor.  "Have you ever asked any

2  Chapter 7 trustee in the state of Alabama to file an employment

3  application  on  your  behalf  in  connection  with  any  of  your

4  clients who were or are in bankruptcy in Alabama?"   "I have

5  never spoken with any bankruptcy trustee in Alabama."

6       So they come in here and they argue in brief to you

7  the Chapter 7 trustee is the one who has the duty to get this

8  done for me.  Let's assume that is true.  The Chapter 7 trustee

9  is supposed to read this man's mind?  He has never talked to

10  one of them.   He is "o" four again.   He has got a perfect

11  record until recently.  In some Rezulin cases that are not at

12  issue here, they have taken a stab here and there at doing it,

13  not near doing it right but a stab.

14       The next page, I asked him if he or his law firm,

15  anybody at his law firm or on his behalf – I asked, "Have you

16  ever had anybody at your law firm or on your behalf ask any

17  Chapter  7  trustee  in  the  state  of  Alabama  to  file  an

18  application to employ you as their counsel in a bankruptcy

19  case?"  "I didn't ask anybody specifically to go and do that."

20       And then I asked "Have they ever been employed?"  "No,

21  not that I am aware of."   "Have they ever been employed to

22  represent  a  Chapter  13  trustee?"   "No."   The  only  thing  I

23  forgot to ask was did you ever talk to a Chapter 13 trustee.

24  I did forget to ask that question, but there is certainly no

25  evidence they ever did.

38

1   And Ms. McKinney testified and Mr. Reding testified,
2   now that I think about it, they certainly never spoke to
3   Gallagher or anybody in his firm about any kind of employment
4   or applications or anything of that sort.

5   We have briefed extensively the cases about duty. I'm
6   not going to belabor those. All of the citations are there.
7   Mr. Ray went and found all there were to find, I'm sure that I
8   ever would have found and more, but pages, I think, 64 through
9   84 of our brief we cover the duty issue.

10   A couple of sort of big points, I want to point you to
11   one case of theirs and I think I am done. First, talk about
12   having material questions of fact, their argument, the linchpin
13   of their argument is he didn't know. I mean, if you look, Your
14   Honor, you can pick where they are on the spectrum. They start
15   off in their first brief particularly in most places and say he
16   never knew people were in bankruptcy, and that just isn't so.
17   At some places they say he didn't know anybody was in
18   bankruptcy before they got money, and that isn't so.

19   And then if you look, it is really interesting, in the
20   reply brief it reads differently. He didn't know anything
21   about the estates where debtors misappropriated money. Well,
22   that is not the test. That is not the issue. That is
23   nonsense. That is not what the issue is. Did he know they
24   were in bankruptcy and did he know before money got
25   distributed. So they are on different places on the spectrum

39

1   in their briefs.

2       But they have contended as a matter of fact that he

3   didn't have knowledge. In fact, they go through Gallagher's

4   deposition and they take all of the questions I asked. You

5   know, it is a discovery deposition and I like to ask questions

6   and I asked him everything I could think of. Did you get this

7   piece of paper; did you get that piece of paper? And they told

8   you all of the stuff where he said, no, I don't know about that

9   and I don't know about this. They just left out all of the

10  good stuff that was there in the deposition we filed that we

11  just thought we would excerpt because they were jumping up and

12  down about how he didn't know. So you certainly have that

13  question of fact.

14      You have all of the notice that goes to him in

15  writing, directly to him, all of the things that went to Bart

16  that Bart and Cazaubon say were forwarded to him. You couldn't

17  have stronger evidence of the guy's notice and knowledge that

18  people were in bankruptcy and him doing nothing about it. So

19  that, in and of itself, there is a material question of fact

20  and it can be their position that he didn't know at all, that

21  he didn't know until this point, or he didn't know until this

22  point, any point on the spectrum they want to pick, it is a

23  question of fact.

24      We cited all of these cases about duty and their duty

25  to get something done. And you can look at them. A lot of

40

1  them are nunc pro tunc cases and what they say is even if, for

2  the sake of argument, it is correct that as an outside attorney

3  you can't yourself get employed, then you have a duty to make

4  sure it gets done and to see what happens, to make sure that it

5  gets done.

6  And it is just absolutely fascinating what you find

7  when you read the other side's cases carefully because their

8  own case tells Mr. Gallagher what he should have done about

9  that if he had called trustees, which he didn't do, and if they

10  had said, no, I won't help you, which they didn't do and which

11  Your Honor knows they would not have done. Ms. McKinney would

12  have been falling all over herself to help these people. That

13  is why she wrote all of the letters. They want the money.

14  That is her job.

15  But, lo and behold, they cite a case called *In re*

16  *Albert*, 206 BR 636, and I'm trying to remember. I think they

17  cite it for the proposition that this guy was allowed to keep

18  his fee because he didn't have knowledge of the bankruptcy case

19  up to a certain point. Is that right, Royce; did I get the

20  right proposition they cited it for?  Do you remember?

21  MR. RAY: I can't remember.

22  MR. OLEN: I believe that is correct, Your Honor. And

23  the court decides that for his prepetition services he is

24  entitled to be paid.  Then they talk about his post-petition

25  services and they talk about the fact that Howard rendered

41

services – and, again, this is their case. They are proud of it. Rendered services for approximately four weeks without knowledge of the filing of the bankruptcy case. And I guess he couldn't get them to get him employed. "On these facts," their case, "the court holds that an attorney has standing to file an employment application over a trustee's objection." Now, no trustees were objecting; they were begging them. So the case they cite says even over the trustee's objection, if you try to get it done and can't get it done and need to get it done, we say you have standing to do it. *In re Albert.*

Then their case goes on to say exactly what Mr. Gallagher should have done. "Once prepetition counsel has knowledge of the bankruptcy case filing, services should not be rendered without both the trustee's assent and court authorization." And then they even point out here are some reasons why you need to do that. There are two problems, that such unauthorized services raise two other problems. That since the debtor's rights vest in the trustee – this was a Chapter 7 case – what right does prepetition counsel have to affect those rights without the trustee's assent. And we had some Chapter 7's here. I want to talk about two Lotronex cases in a minute. Gallagher is running around dealing with these Chapter 7 trustee's cases, doesn't tell them he is out there, and he wants to say, well, the debtor should have done that. Well, maybe so, but that doesn't get him off of the hook. He

42

1    is dealing with estate property and he is not telling anybody.

2    And then the second thing they point out is in, you

3    know, a Chapter 7, they say as a basic precept of legal

4    practice, without the trustee's assent, where is Gallagher

5    getting his authority? Who is his client? It is just a very

6    good case. I love the case. I wish I had found it and used it

7    in my brief but, you know, that is their case they rely on for

8    a different proposition.

9    Now, I want to make another point. There are two

10   debtors and their names are Billie Montgomery and Carolyn

11   Stevens, and I thought I had a pad with them and maybe I do and

12   maybe I don't. Let me see. And in both of their briefs the

13   Gallagher defendants say, hey, starting in 2003 we were doing

14   these Pacer searches, we were proud of ourselves, give us a pat

15   on the back, we are trying to do the right thing. But here is

16   what they say in their brief: Something about maintaining the

17   status quo. That that is what they are doing. Now these are

18   Chapter 7 cases, Your Honor. That they are maintaining the

19   status quo. Now they know these bankruptcies are out there.

20   They certainly knew about them as a result of this litigation

21   and they are maintaining the status quo, whatever that means.

22   And then I was looking for one of the places they said

23   it, but I guess I am not going to be able to find it quickly

24   enough. Oh, here we are. I knew I would find one. Page

25   fifty-five. He, referring to Gallagher - it is the paragraph

43

1    talking about the two Lotronex claims. I don't think it is in

2    any of the tabs I gave you but it is page fifty-five of their

3    first brief. "With respect to the two Lotronex claims, once

4    Gallagher learned of pending bankruptcies and the fact that he

5    may not be able to accept the referral," – which I think is

6    nonsense. He is representing the people. He already accepted

7    the referral a long time ago – "he has preserved the status quo

8    while referring counsel in bankruptcy estates determine what to

9    do."

10    Now if that had started a month ago, that might be a

11    reasonable position to take. We know we told them about

12    Stevens and Montgomery back sometime in probably mid to late

13    '04 because we took the client list that Judge Stilson ordered

14    them to produce. We did all of our Pacer searches.

15    Lo and behold, when they had to update their client

16    list for us back in April of last year when Your Honor

17    compelled them to do so, if you would look at tab forty-four.

18    Hopefully it is there. There should be behind tab forty-four,

19    that would be Plaintiff's Exhibit 4212, and you will see –

20    this is a document that Mr. Gallagher produced to us. It is

21    dated April 20, 2005. It says Alabama Lotronex. We have got

22    our Bates number starting with a two, so we know it came from

23    him. If you will turn to the second page, you will see Billie

24    Montgomery, a Chapter 7 debtor in the Middle District of

25    Alabama. In fact, Billie Montgomery is the case – and I will

44

1    come back to this point in a minute – where the one lawyer

2    sought to be employed by the trustee but didn't bother to tell

3    Ms. DePaola that he was going to share his fee with Michael

4    Gallagher and other people.  He just forgot about that.

5         But what is interesting here, Your Honor, is it shows

6    Billie Montgomery; it shows the date she filed her bankruptcy;

7    but look at what it shows in the far right column.  That's the

8    date they did their bankruptcy search.  They had been deciding

9    what to do with Ms. Montgomery's case, Mr. Gallagher has, for

10   two and a half years.  He has been preserving the status quo

11   with a Chapter 7 Trustee's case.  And lo and behold they now

12   indicate they got a settlement in the case.  I was hoping Ms.

13   Jacobs was still here since she was here on the day of the

14   Montgomery application.

15        What do they do about this case?  Did Michael

16   Gallagher come in here and be up-front with you and say I want

17   to get employed?  No.  Two times no.  He sends Richard Freese

18   in here.  Freese gets asked that the Chapter 7 trustee to

19   employ.  They file an application.  Doesn't disclose that he is

20   sharing his fee with Gallagher, doesn't say anything about

21   Gallagher.  They have done the same thing in the Carolyn

22   Stevens case where Bill Carn is the trustee.  The only person

23   who sought to be employed is Richard Freese, a lawyer who is

24   co-counsel with Gallagher in these cases, and I just bet that's

25   a coincidence that only Mr. Freese has sought to be employed

45

1    and not Mr. Gallagher.

2           Two and a half years is way, way too long to be, (a),

3    preserving the status quo and, (b), deciding what it is you are

4    going to do.  Mr. Gallagher himself said if you don't get the

5    right bankruptcy approvals, you withdraw.  Now they threaten in

6    their brief.  They say, hey, if you guys are going to keep

7    objecting to our applications like we did in these cases where

8    Freese fronted for them and didn't disclose he was sharing a

9    fee and Gallagher comes in and says, well, you know, you are

10   going to do that to me, I will take my marbles and I will go

11   home and I won't include them in my group settlement.

12          Judge, he should have made that decision a very long

13   time ago.  He has been sitting on Ms. Montgomery's case since

14   October of 2003 in terms of knowing she was in bankruptcy.

15   That is just incredible.

16          And if you turn to the next page, Carolyn Stevens,

17   they get a break there.  They only knew about that since

18   November of '03.  They have done nothing, nothing.  Bill Carn

19   and Susan DePaola didn't know Michael Gallagher had an interest

20   in those cases because Michael Gallagher did nothing to contact

21   them, nothing to notify them.  He has done nothing.

22          If I might have just a minute, I think I am about

23   finished.

24          (Pause)

25          Just a couple of quick points.  My friend, Mr.

46

1    Stewart, has taught me never try to tell a judge or suggest to

2    a judge what his own decisions say. We would simply point out

3    that *Tri-State* does talk about the nondelegable duty of court

4    approval of employment and so forth, and Your Honor writes to

5    the same point in the first order on the first Martin motion

6    for summary judgment. I think you refer briefly to Tri-Plant

7    Foods - is it Tri-Plant or Tri-State?

8             MR. RAY: *Tri-State.*

9             MR. OLEN: *Tri-State.* I am sorry. And it mentions

10   that nondelegable duty again. And in one of those two orders

11   I think Your Honor mentions that there might be an issue about

12   whether 327 applies in a thirteen. And in the first brief the

13   Gallagher defendants wrote - as you can tell, Mr. Ray has

14   pointed this out to me. They concede that 327 does apply in

15   both Chapter 13 and Chapter 7, and I was told specifically to

16   make sure I point out to you they say that in their brief.

17            The last point, in the first brief to some extent and

18   in their second brief to more of an extent, the Gallagher

19   defendants talk a lot about the Rezulin cases and some about

20   the Lotronex cases. Among the debtors we have identified in

21   this case, there are no Rezulin claimants. The first we

22   realized Gallagher was representing people who had Rezulin

23   claims was when they updated their discovery sometime last year

24   that we worked on that. And the one point I want to address is

25   what they mention in their reply brief because obviously we

47

1    have not had a chance to respond to it.  Essentially what they

2    say is, hey, you told us you wanted us to go get employed and

3    so we went and tried to get employed in the Gloria Calhoun case

4    and you objected.  And, you know, they are telling us basically

5    in their brief that isn't fair, we objected.

6        Well, we objected, one, because they waited so darn

7    long before they did anything, and you have seen just some of

8    that, and they have got printouts on Rezulin cases and some of

9    their Rezulin people they knew about going into '03, too,

10   because that's when they did these Pacer searches.  And I don't

11   want to talk about all of the Rezulin cases, but I want to

12   point out that just because somebody files an application to be

13   employed, you know, if it took them years and years to do it or

14   if there is a defect with them, the trustee not only has a

15   right, we think the trustee has an obligation and a duty to

16   speak up, particularly when they do things like have Richard

17   Freese as co-counsel seek to be employed by trustees and not

18   tell this court, not tell the trustee, not tell the B.A. there

19   are a whole bunch of other people sharing in the fee.

20       In fact, those cases, Your Honor, Gallagher, Martin

21   and Goss are all co-counsel with Freese and none of those folks

22   sought to be employed in either of those cases.

23       And they did finally get around to filing a bunch of

24   applications - I think there are twenty something of them - and

25   those, so far, they, Richard Freese, Michael Gallagher and

48

1    Jason Stuckey, the three of them have filed to be employed in

2    about twenty something cases. And so far again they have a

3    perfect record. They have two of them denied in Birmingham.

4    They have had two denied in Mobile and they have withdrawn all

5    of the rest. And the reason they did that is we got upset

6    about the fact if you look at Gloria Calhoun, the one they make

7    part of the record, this employment application that was filed

8    February 16 of 2005, or somewhere in there, mid February, Mr.

9    Gallagher's affidavit is dated April of 2005. Now, you know,

10   why he waited all of those months, I don't know. I am

11   certainly looking forward to asking him that at the trial.

12       But what they did with all of their applications in

13   the Northern District and the Southern District - and this is

14   why they are backing up - is Mr. Gallagher has so little regard

15   for the bankruptcy system in Alabama that his co-counsel sent

16   him an example application. It says "example" on it where the

17   debtor's name is. And fourteen signature pages that all say at

18   the top, "I declare under penalty of perjury" with no

19   application attached, and he signed it and he sent them back to

20   his co-counsel and they got filed all around the state except

21   not here, in the Northern and the Southern District. That is

22   why they withdrew those applications, and that is indicative of

23   what they think of the bankruptcy system in Alabama, that and

24   what you have seen about they didn't know and what they really

25   knew.

49

1        Thank you.

2        THE COURT: Thank you.  Mr. Anderson.

3        MR. ANDERSON: Your Honor, fortunately what we deal

4    with here is evidence and not argument.  So I am going to try

5    to stay with the evidence and not argument.  We have heard Mr.

6    Olen say at least three times that Mr. Freese didn't tell this

7    court, didn't tell the trustees that he was sharing his fees

8    with any other attorneys.  Well, what was filed with this

9    court, signed by Mr. Freese, says I have agreed to share my

10   compensation obtained from this case with other attorneys in my

11   group, including the referring attorney, Morris Bart.

12        So we now know that Mr. Olen has made a false

13   statement to the court three times in argument, and that is

14   basically consistent with what else we are dealing with here.

15        Let's look at what he is saying.  The evidence before

16   this court is from Morris Bart and it comes from Lisa Cazaubon

17   and it comes from Ms. Crory.  Once a Bart firm client checked

18   "yes" indicating that he or she was in bankruptcy, Cazaubon

19   would tell those clients that she could not give them their

20   money at this time and that, per the instructions of the

21   special master, she had to forward the disbursement sheet, as

22   well as the check, back to him, the special master.  The

23   distribution checks and settlement checks for clients who

24   checked "yes" indicating that they were in bankruptcy were then

25   forwarded to the Phen-Fen special master, Butch Cothren.  They

50

1    didn't say they were sent to Mike Gallagher.  Mr. Olen said
2    they were sent to Mike Gallagher.  And what he looks to, to
3    prove that, is the series of correspondence that occurred after
4    September of '01.  He pulls out testimony of Lisa Cazaubon and
5    she says, well, that would have been sent to Mike Gallagher,
6    and then he says because something would have been sent after
7    September, this letter, that obviously these sheets that they
8    testified weren't sent to him were sent to him.  That is not
9    evidence.

10       They ask Mr. Gallagher, "Nobody at the Bart law firm
11   had given you copies of these three earlier letters, right?"
12   And he says, "Not to my knowledge, no."  I guess that means
13   yes.  "Nor told you about them?"  "No, sir.  Correct."  That's
14   the evidence before this court, and I guess we are now down to
15   five people he has mentioned.  It is interesting, this one we
16   didn't know about, Sandra Joiner, the part he didn't tell you
17   was Morris Bart did give her her money.  And you know what she
18   did with it?  She paid her plan off and a hundred percent she
19   paid it off, but he didn't want you to know that.

20       I guess the only other thing I would say is, Judge, I
21   think you said it, I think the statute is clear that it is
22   pretty clear in a seven and an eleven it is the trustee or the
23   debtor-in-possession that has to make the application.  And in
24   a thirteen, depending on what the situation is with the case,
25   you may or may not have to make an application to hire counsel.

51

1          Now, Mr. Gallagher occupies a special position in this

2     case.  He and these other lawyers have negotiated these group

3     settlements and these group settlements are offers to these

4     people if they want to take it.  And if they want to take it,

5     they can take it; if they don't want to take it, they don't

6     have to take it.  And he is in a situation where he doesn't

7     have a contract with these people.  The contract is with Rich

8     Freese.  You know, the contract is with Pittman Hooks.  The

9     contract is with Morris Bart.  And they get the contract and

10    then they refer it and they say we want to participate in this

11    settlement.  And Mr. Gallagher runs a Pacer search and says,

12    "Well, you sent us somebody who is in bankruptcy, they don't

13    have a claim, their estate has a claim.  We can't accept it."

14    And we tell them we can't accept it and they go back to the

15    trustees and the trustees and the debtors have the duty to get

16    that asset and liquidate it for the benefit of the creditors

17    and what do they do?  They do nothing, nothing.  For two years

18    they have done absolutely nothing, and then they come in here

19    and Ms. DePaola files one and her lawyer stands up and objects

20    to it.

21          You know, what I am going to do - I have not filed any

22    of these and Mr. Gallagher is willing to cooperate and that's

23    why months ago he said, "If I need to sign an affidavit, you

24    know, you show me the form affidavit that fits every one of

25    these cases, the same affidavit fits every one of these cases,

52

1 I will sign it and you can use it and go in there and get these

2 settlements done. I will cooperate." And apparently they

3 don't want the money.

4 So what I am going to do, I am going to try to file

5 these although I don't have authority to, but I am going to ask

6 the court under section 105 if I can't do the trustee's and the

7 debtor's job and get these things filed and get it before the

8 court. And if the estate and the creditors don't want the

9 settlement, then Morris Bart can keep the case and he can go

10 try it. If they don't want the settlement, then Rich Freese

11 can go try the case for them. If they don't want the

12 settlement, then Chris Hellums can go try the case for them.

13 And so what we have done is we have prevented any of

14 this money going to the wrong people, and we have done the

15 right thing and we have done absolutely nothing wrong and there

16 is not one shred of evidence that we knew about any of these

17 bankruptcy cases before any money was paid to the wrong person.

18 And so I think the case is over.

19 Thank you.

20 THE COURT: Thank you. Okay. This is before the court

21 on a motion for summary judgment, governed by the provisions of

22 Bankruptcy Rule 7056 of the Bankruptcy Rules, which then

23 incorporates Rule 56 of the Federal Rule of Civil Procedure,

24 and I won't read the whole rule. I am looking at Rule 56(c).

25 "The judgment sought shall be rendered forthwith if

53

1          the    pleadings,    depositions,    answers    to

2          interrogatories, and admissions on file, together with

3          the affidavits, if any, show there is no genuine issue

4          as to any material fact and that the moving party is

5          entitled to judgment as a matter of law."

6          Well, I have been going through and listening to this

7   for an hour and a half.  I have spent a number of hours reading

8   the briefs previously, but one thing I think it is safe to say

9   is there is plenty of dispute as to material facts.

10          For that reason, I find that the motion for summary

11   judgment filed by the Gallagher defendants is not well taken

12   and I am going to deny the motion.

13          Gentlemen, we are set for trial May 22.  We will see

14   you then.

15          Thank you all.

16          (Off the record at 11:43 p.m.)

54

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Patricia Basham, Transcriber

Date: April 5, 2006