# APPENDIX 6

```
 1     IN THE UNITED STATES BANKRUPTCY COURT FOR

 2          THE MIDDLE DISTRICT OF ALABAMA

 3

 4   IN RE:              CASE NO. 00-06028-WRS

 5   EDWARD CHILDS, Debtor.

 6                    * * * * *

 7   CURTIS C. REDING, in his capacity
     as Chapter 13 Standing Trustee,
 8
             Plaintiff(s)
 9
     VS.              Adversary No. 03-01071
10
     MORRIS BART, A.P.L.C., etc.,
11
             Defendant(s).
12

13

14

15

16          DEPOSITION TESTIMONY OF:

17                MORRIS BART

18

19

20   May 3, 2005

21   8:20 a.m.

22

23   REPORTED BY:   Virginia P. Corker, CSR
```

TAMI S. GUTHANS COURT REPORTING
118 N. ROYAL STREET, SUITE 603
MOBILE, ALABAMA  36602
(251) 432-8703 * (800) 437-7784

1  that?

2  A    What we did on these cases is once
3  we determined that a client was in
4  bankruptcy, we then contacted the members of
5  our team, who would be Mike Gallagher, Ben
6  Martin, Tim Goss.  Oftentimes we were
7  referred to Butch Cothren, and based on
8  their advice or instructions we acted on it.

9  Q    Let me ask you this.  On this
10 group of Fen-Phen cases, as it related to
11 bankruptcy issues, isn't it true that Ben
12 Martin didn't become a member of the, quote,
13 team until late September of 2001?  Isn't
14 that right?

15 A    I don't know when he became a
16 member.

17 Q    Let me ask you next to look at
18 Exhibit 3695.  Did anyone at your law firm
19 ever bring to your attention the fact that a
20 lawyer named William Robertson contacted
21 your firm on behalf of your client Finestra
22 Truss to see about getting her Fen-Phen
23 settlement money?  Did anybody ever make you

1  aware of that?
2  A    I am not sure if that was done or
3  not without more information.
4  Q    All right.  Look at 3696, the
5  letter.
6  A    Um-hum.
7  Q    Now, this is a letter to your law
8  firm from William E. Robertson, and I
9  believe the letterhead shows that he was the
10 retired presiding judge of the Alabama Court
11 of Civil Appeals?
12         Do you see that?
13 A    I do.
14 Q    Now, if we go back a minute to
15 your law firm log, which is the previous
16 Exhibit 3695, it says, with a date sometime
17 in February, (Reading):  Bill Robertson
18 called claiming to represent Ms. Truss re
19 her bankruptcy case.  I do not feel as
20 though he is who he claims to be.
21         Did anyone ever indicate to
22 you that people in your law firm thought
23 this retired presiding judge of the Alabama

 1  bankruptcy debtors' attorneys and trustees
 2  had to call your law firm and tell you that
 3  you needed to file motions to approve
 4  settlements before y'all went ahead and did
 5  it without simply deferring to Gallagher and
 6  the team?
 7          MR. MEMORY:  Object to the form.
 8  You may answer.
 9     A    I would assume my office, every
10  time it got a call, would pass that on to
11  the other members of our team, who was
12  Gallagher's office, Tim Goss or Ben Martin.
13  And I would also expect that they would
14  either take care of it or would give us
15  specific instructions on what we should do
16  to get this matter resolved.
17     Q    (BY MR. OLEN):  Was there anything
18  that any bankruptcy debtor's attorney, or
19  Chapter 13 or Chapter 7 trustee could have
20  done in the way of writing your firm a
21  letter, or getting somebody in your firm on
22  the telephone, that would have caused you to
23  respond directly to them by filing something

```
1           MR. MEMORY:  Object to the form.
2       A   That's not true.
3       Q   (BY MR. OLEN):  Okay.  Now, let's
4   clear something up.  This is June 21.  This
5   is four months before Ben Martin got
6   involved, isn't it?
7       A   I don't know.
8       Q   All right.  Skip down to the entry
9   that says 7/07.  (Reading):  Received letter
10  from McCulley.  Will talk to Lisa about what
11  to do.  Per Lisa, send letter to Cothren
12  with McCulley's letter attached to see what,
13  if anything, needs to be done by our office.
14              If y'all were always checking
15  with Gallagher, how come none of these notes
16  we have been reading, two of which you were
17  personally involved in, say word one about
18  Gallagher?  How come?  Why is that?
19      A   You will have to ask Lisa.
20      Q   No, sir.  I am asking you because
21  you were involved in two of the entries on
22  the previous page.  How come you didn't tell
23  Lisa to call Gallagher?
```

1    A    Well, my answer is that I don't
2  know that she didn't call Gallagher.  Just
3  because it's not on this sheet doesn't mean
4  she had many conversations with Gallagher.
5    Q    I agree with you, but I can't ask
6  you that.  What I asked you was why didn't
7  you tell her to call Gallagher?  That is the
8  question.  Why didn't you do that, because
9  you say Gallagher was where everything
10  needed to be routed per the team concept.
11  Why didn't you do that?
12    A    I am not sure I didn't do that.  I
13  may very well have told her to call
14  Gallagher.  She might have told me:  I am
15  going to call Gallagher and let him know.
16         We probably talked to
17  Gallagher's office several times a day when
18  this was going on, so there -- the logical
19  assumption is she did talk to Gallagher's
20  office.
21    Q    Look at the bottom entry on the
22  page.  (Reading):  Met with Buddy.  Buddy is
23  you, right?

1    A    Yes.

2    Q    (Reading): He said return his
3  call but don't worry. Cothren will handle.
4         Did I read that right?
5    A    Yes.
6    Q    How come it doesn't say: Don't
7  worry. Gallagher will handle? Because
8  that's the way you have told us it was
9  handled routinely.
10   A    I can't speak for what Lisa did
11 and did not put down. You are going to have
12 to ask her that.
13   Q    All right. Turn over to the next
14 page, the second entry is 9/19. (Reading):
15 Met with Buddy.
16        That's you?
17   A    Right.
18   Q    (Reading): He said to send letter
19 to McCulley telling him Goss will handle it.
20        Here you are telling Lisa to
21 have Goss handle it. I still don't see
22 Gallagher mentioned. Why is that?
23   A    Well, because you don't want to

TAMI S. GUTHANS COURT REPORTING
118 N. ROYAL STREET, SUITE 603
MOBILE, ALABAMA   36602
(251)432-8703 * (800)437-7784

1  see it.  That's why.  I mean, it's very
2  obvious.  It supports exactly what I keep
3  telling you over and over again.
4      Q    Well, then, if it's so darned
5  obvious, why don't you show me right here
6  where the word Gallagher is in that entry,
7  sir?
8      A    Because, as I told you, we would
9  call Gallagher's office.  He worked as a
10 team with Tim Goss and Ben Martin.
11 Obviously, some conversation took place
12 where Gallagher's office referred us to Tim
13 Goss, and now Lisa is dealing with Tim Goss,
14 and that's what that reflects.
15     Q    Now, this entry doesn't say a word
16 about Gallagher, does it?
17     A    No.
18     Q    It says (Reading):  Met with
19 Buddy.  He -- Buddy.  You.  (Reading):  said
20 to send letter to McCulley telling him Goss
21 will handle it.
22          Did I read that right?
23     A    Yeah.

```
 1      Q     We have been through June 14, June
 2  19, August 17 and September 19, four entries
 3  in which you were involved, and there isn't
 4  one word about you ever saying the first
 5  thing to Lisa Cazaubon about Gallagher, is
 6  there?
 7      A     Not that we have seen in the
 8  activity log.
 9      Q     And then at the bottom somebody
10  says (Reading):  Tell Kate okay to close
11  this one out.
12                  Do you see that?
13      A     I do.
14      Q     At that point had y'all filed any
15  type of pleading, motion or application in
16  the bankruptcy court?
17      A     I don't know.
18            MR. OLEN:  That's a convenient
19  point.  Why don't we take a break.
20            MR. PARKER:  Take a break for
21  lunch?
22            MR. OLEN:  Yes.
23                  (Lunch Break).
```

```
 1           MR. MEMORY:  Object to the form.
 2   Answer, if you can.
 3       A    I would think before we would do
 4   that we would have at least called him and
 5   told him this is the action that's
 6   requested.  Is he agreeable with it?  Is his
 7   office going to do it?  Or would he like us
 8   to do it?
 9       Q    (BY MR. OLEN):  Did that ever
10   happen?  When y'all got all these calls from
11   David Cottingham and Cal Wilson, did y'all
12   ever call up Michael Gallagher and say:
13   Hey, debtor's attorney, Chapter 13 trustee
14   are telling us this is what we got to do,
15   what are we going to do?
16           MR. MEMORY:  Object to the form.
17   Go ahead.
18       A    I am sure we did, but Lisa
19   Cazaubon would be the one that would
20   directly know.
21       Q    (BY MR. OLEN):  Well, let's get it
22   nailed down.  Did you ever have a
23   conversation with Michael Gallagher, or
```

1  anybody at his law firm, in response to the
2  telephone call your law firm got from David
3  Cottingham, recorded in y'all's own
4  documents, where he told y'all you had to
5  file certain motions in bankruptcy court?
6  Did you personally talk to anybody at
7  Gallagher?
8      A    No, I don't recall doing that.
9      Q    Why in the world didn't you?
10     A    Well, because I have someone named
11 Lisa Cazaubon, who was the attorney in
12 charge of that section, and she was handling
13 the day-to-day and the communications with
14 Gallagher's office.
15     Q    If Cleve Reding, or his staff
16 attorney Sabrina McKinney, had told your law
17 firm that you needed to file certain motions
18 or pleadings in bankruptcy cases in
19 Montgomery, would y'all have done what they
20 said you needed to do?
21          MR. MEMORY:  Object to the form.
22 Go ahead and answer if you can.
23     A    Our procedure would have been to

```
 1    A     I do.
 2    Q     And then May 13, 2002 S. Rogers,
 3  Sherrie Rogers again, (Reading):  Left voice
 4  message again for Katie to call.
 5            And then you will see there is
 6  no return phone call.  Was your law firm
 7  personnel simply instructed to ignore Ms.
 8  McKinney's letters and her paralegal's phone
 9  calls?
10    A     No.
11    Q     Can you offer any explanation for
12  why Ms. McKinney's eight letters, and
13  paralegals two phone calls, went unanswered
14  by anybody from your law firm by either a
15  phone call or a letter?
16            MR. MEMORY:  Object to the fact
17  there were eight letters.  There were six
18  letters and two phone calls actually.  Go
19  ahead.
20    A     No, I don't have any explanation,
21  other than with the letters I would assume
22  that those were forwarded to Gallagher's
23  office.
```

```
 1       Q      (BY MR. OLEN):  But you have seen
 2  no documentation of that?
 3       A      I have seen none today.
 4       Q      Well, and we have seen none in the
 5  documents produced in discovery by your law
 6  firm.  Do you have any explanation, knowing
 7  that additional information?  That change
 8  your answer in any way?
 9       A      That would not change my answer.
10       Q      What more could Sabrina McKinney,
11  a staff attorney for the Chapter 13 trustee,
12  what more could she have done, besides write
13  six letters, if that's correct, and have her
14  legal assistant make two phone calls, to get
15  your law firm to respond to her about the
16  Childs and Hicks cases?  What else could she
17  have done?
18       A      I can't speculate on what she
19  could or could not have done.
20       Q      The truth is there was nothing she
21  could do that was going to get y'all's
22  attention in terms of getting y'all to file
23  any kind of appropriate paperwork in the
```